## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Samantha Menzer, individually and on behalf of all others similarly situated,<br><br>            Plaintiff,<br>v.<br><br>Fanatics Holdings, Inc., Fanatics Collectibles Topco,  Inc.,  Fanatics Collectibles Intermediate Holdco, Inc., Fanatics Retail Group North, LLC, Fanatics LLC, and John Does,<br><br><br><br>            Defendants. | Case No.:<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Samantha Menzer ("Menzer"), individually and on behalf of all others similarly situated, for her Class Action Complaint, brings this action against Defendants Fanatics Holdings, Inc., the parent company and its subsidiaries and/or affiliates Fanatics Collectibles Topco,  Inc. ("Fanatics Collectibles") Fanatics LLC, Fanatics Retail Group North, LLC, Fanatics Collectibles Intermediate Holdco, Inc., d/b/a Fanatics Trading Cards, and Fanatics, Inc. (Defendants hereinafter are collectively referred to as "the Company" or "Fanatics") and John Does, and alleges as follows:

### I.        INTRODUCTION

1.        This is a consumer Class Action against Fanatics, an apparel and memorabilia company, for its false advertising, unfair and deceptive marketing practices, breach of implied contract, and materially misleading claims and omissions it negligently employed and disseminated in connection with the sale of its memorabilia products.

2.        This case is on behalf of consumers of Fanatics' sports memorabilia who paid unjust premiums for unique authentication IDs for their treasured pieces of team or player history

when, in reality, Fanatics knew (or should have known) a counterfeit operation was mimicking the Company's products including the unique authentication identification markers, resulting in unjust enrichment to the Company and degrading legitimate purchasers' memorabilia. As a result of the Company's misconduct, purchasers such as Plaintiff and Class Members did not receive the full benefit of the bargain for which they paid.

3.     On July 15, 2025, a counterfeit operation of sports memorabilia was raided by the Federal Bureau of Investigation ("FBI"). Earlier that day, Brett Lemieux ("Lemieux"), 45 years old of Westfield, Indiana posted online in the Facebook sports memorabilia group 'Autographs 101' that he and his fellow co-conspirators had "sold and produced holograms" and or Certificates of Authenticity ("COA") of counterfeit sports memorabilia products from Fanatics as well as other well-known sports memorabilia companies.[1]

4.     Lemieux and his co-conspirators "[p]urchased millions of dollars of legit items" and mixed in their counterfeit items into the market, stating that "95% of the Mahomes and Aaron [J]udge on the market are" counterfeit. Regarding Fanatics, Lemieux specifically stated "I bought so much they didn't know what to say or do… I set out to make as many [F]anatics counterfeit stickers I could. Millions upon millions."[2]

5.     Lemieux and his criminal co-conspirators "had every hologram we ever made extracted from every company['s] database… So with a touch of a button I can type [an athlete's name] and a bin shoots out with every [Athlete's] sticker hologram or [COA] card… The fact that

---

[1] Matt Schilling, *Billion Dollar Counterfeit Scheme Rocks Autographed Sports Memorabilia Market*, Sports Illustrated, July 18, 2025, https://www.si.com/collectibles/billion-dollar-counterfeit-scheme-rocks-autographed-sports-memorabilia-market, last visited September 3, 2025.
[2] *Id*.

not one dealer that knew what we were doing to the industry, or when I took their exclusive…ever picked up a phone to confront me…baffled me."[3]

6.     Lemieux added that companies like Defendants "knew better." When companies made changes to their Holograms or COAs, Lemieux and his fellow criminals made changes too.

7.     Fanatic's president of specialty business and new ventures, Zohar Ravid ("Ravid"), was asked by The Athletic about the counterfeit operation. He stated the Company is "constantly monitoring what is happening in the ecosystem, especially in the marketplaces. And so we were able to follow [Lemieux]. We knew about [Lemieux] as long as seven or eight years ago at this point. … Our No. 1 concern is protecting the market, protecting the fan and ensuring that good actors like ourselves and other players aren't being hurt because of a few bad apples… ."[4]

8.     Plaintiff and Class Members purchased items from Fanatics with a COA or Hologram for a premium because of the item(s)' advertised authenticity and exclusivity.

9.     The Company knew its COAs, Holograms, and Unique IDs (hereinafter "UID") were compromised, yet nevertheless continued to sell the items to Plaintiff and similarly situated consumers at a premium because of the added value from COAs, Holograms, and UIDs establishing the item(s)' authenticity and exclusivity.

10.     Due to Defendants' conduct, Plaintiff and class members are now in possession of items worth far less than what they paid for them as the COAs, Holograms, and UIDs establishing the authenticity and exclusivity are compromised.

---

[3] *Id.*
[4] Larry Holder, Fanatics aided criminal investigation into sports memorabilia dealer. The dealer was later found dead., The Athletic, July 18, 2025, https://www.nytimes.com/athletic/6501407/2025/07/18/brett-lemieux-fake-autograph-case/, last visited September 3, 2025.

11.    Defendants betrayed the trust of Plaintiff and the other Class Members by failing to properly safeguard and protect their COAs, Holograms, and UIDs yet continuing to knowingly sell their memorabilia at a premium that had COAs, Holograms, or UIDs supporting their authenticity and exclusivity. As a result, Plaintiff and Class Members paid more for a product that the Company knew was worth far less than the price at which it was being sold.

12.    Plaintiff brings this action individually and on behalf of the Class, seeking remedies including, but not limited to, actual damages, compensatory damages, injunctive relief, reasonable attorney fees and costs, and other remedies this Court deems proper.

## II.    THE PARTIES

13.    Plaintiff Menzer is a resident and citizen of Palm Beach County, Florida.

14.    Defendant Fanatics Holdings, Inc. is a Delaware corporation with its principal place of business in New York, NY, and is believed to do substantial business in this District.

15.    Defendant Fanatics Collectibles Topco, Inc., is a Delaware corporation with its principal place of business in New York, NY, and is believed to do business in this District.

16.    Defendant Fanatics Collectibles Intermediate Holdco, Inc., d/b/a Fanatics Trading Cards is a subsidiary of Fanatics Holdings, Inc., and a Delaware Corporation with its principal place of business in New York, NY, and is believed to do business in this District.

17.    Defendant Fanatics, LLC, is a Delaware LLC with its principal place of business in New York, NY and is believed to do business in this District.

18.    Defendant Fanatics Retail Group North, LLC, is a Delaware LLC and an affiliate or subsidiary of Fanatics Holdings Inc., with its principal place of business in New York, NY, and is believed to do business in this District.

19.     Defendants Fanatics Holdings, Inc.; Fanatics, Inc.; Fanatics, LLC; Fanatics Collectibles Intermediate Holdco, Inc.; Fanatics Collectibles Topco, Inc., and Fanatics Retail Group North, LLC are technically separate entities but operate as one unified company under the name "Fanatics." The allegations herein are against the Fanatics companies both individually and collectively.

20.     The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiff. Plaintiff will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known. Plaintiff has named John Does as Defendants in the interim.

21.     All of Plaintiff's claims stated herein are asserted against Defendants and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

### III.     JURISDICTION AND VENUE

22.     This court has subject matter jurisdiction under the Class Action Fairness Act § 1332(d) ("CAFA") as there is minimal diversity between Plaintiff and Defendants, the class contains at least one hundred (100) members, and the aggregate amount in controversy exceeds $5 million.

23.     This Court may exercise personal jurisdiction over Defendants because each of the Defendants is headquartered in this District, markets and distributes memorabilia in this District, enters into contracts within this District, and/or otherwise transacts business within this District. Fanatics conducts substantial business in this District and sold or solicited Plaintiff and Class Members in this District and has purposefully availed itself of the privilege of doing business in the

State, including by selling memorabilia and other products with COAs, Holograms, and/or UIDs within the state of New York.

24.     Venue is proper in this District because Defendants operate and conduct business in this District, as each of the Defendants resides in, transacts business, committed an illegal or tortious act, has an agent within, and/or can be found in this District.

## IV.    FACTUAL ALLEGATIONS

### A.  SPORTS & ENTERTAINMENT COLLECTIBLES

25.     The sports and entertainment collectibles industry generates tens of billions of dollars in annual sales of memorabilia from areas such as sports, entertainment, music, television, and film; items from collectible trading card games (*e.g.*, Pokémon, Magic: The Gathering); merchandise from diverse entertainment franchises (such as Disney trading pins and Marvel action figures); game-worn sports jerseys, shoes, gear, equipment, and other memorabilia; and a variety of miscellaneous items such as ticket stubs and bobbleheads.

26.     Collectibles vary from autographs and trading cards to action figures, bobble heads, pins, limited-edition trading game collectibles, and entertainment collectibles such as movie props and television posters.

### B.  BACKGROUND ON FANATICS

27.     Fanatics and its many entities developed out of CEO Michael Rubin's purchase of the Fanatics sports e-commerce business in 2011. By then, the Fanatics brand included hundreds of e-commerce partners across North American leagues, teams, and colleges. "An emphasis was immediately placed on real-time manufacturing, data, and technology, which would underpin the company's differentiated vertical commerce (v-commerce) model." The Fanatics Commerce business has transformed from a domestic e-commerce company, selling mostly third-party

merchandise, into a mobile-first, direct-to-consumer global brand with its own manufacturing capabilities to serve the growing real-time expectations of fans worldwide. Through the addition of well-known brands such as Mitchell & Ness and Lids, the business continues to expand into new verticals to deliver unique experiences for fans around the world. As Fanatics saw its innovation across the licensed sports merchandise landscape continue to grow, the company set its sights on expanding beyond fan merchandise. In August 2021, Fanatics announced plans to evolve into a leading global digital sports platform, which opened the door for two new businesses to be established, Fanatics Collectibles and Fanatics Betting & Gaming. Fanatics Collectibles is a leading licensor, producer, designer, and seller of physical and digital trading cards, sports memorabilia, and other digital assets for entertainment and sports properties globally, as well as a manufacturer of physical and digital trading cards. These businesses all fall under a new corporate entity called Fanatics Holdings, Inc., which continues to be led by Michael Rubin. Across the Fanatics enterprise, there are currently more than 22,000 global employees working across more than 80 offices and locations. [5]

28.     Over the last two decades, Fanatics claims it has continued to innovate in licensed fan gear, operating a "world-class organization[.]" The Company is best-known for sports memorabilia and e-commerce, as well as designing, manufacturing, and selling officially licensed sports fan gear, jerseys, headwear, and other sports merchandise. "Fanatics has become a fan favorite and trusted partner of athletes, players' associations, sports leagues, and teams thanks to a vision and business model that emphasize integrity, authenticity, quality, innovation, and customer satisfaction. Fanatics' established relationships with leagues and players' associations

---

[5] See https://www.fanaticsinc.com/history, last visited September 3, 2025.

through its sports merchandise business provided a strong platform for Fanatics to help launch its successful collectibles business."[6]

29.    For over 15 years, Fanatics has operated the official e-commerce sites for certain sports leagues in the United States, including the NFL, MLB, NBA, and NHL, along with many professional and collegiate teams. It has significantly increased e-commerce sales. Fanatics has consistently expanded its rights, including the right to produce a broad range of apparel such as jerseys, championship products, and most recently collectible products. Fanatics has also partnered with major entertainment companies, including World Wrestling Entertainment, Inc. ("WWE").

30.    Fanatics sells licensed consumer products for these companies on its website, along with products related to music, pop culture, and other segments of the entertainment industry.[7]

31.    Fanatics claims, "Shaking up long-established industry norms, Fanatics Collectibles has dramatically reduced reliance on redemption cards, created innovative, one-of-a-kind collectibles such as MLB Rookie Debut Auto Patch Cards (which it has since extended to other sports), invested in a card manufacturer to enhance production quality across the board, and revitalized interest in the hobby by partnering with hobby shop owners, card breakers, and athletes to create unique marketing events and experiences for collectors."[8]

32.    Fanatics Collectibles has tapped into new revenue streams and business lines, such as exclusive autographed memorabilia.

33.    Fanatics revenue exceeded $8.1 billion in 2024, up over 15% from 2023.[9]

---

[6] *See Fanatics Collectibles Topco, Inc. v. Panini S.P.A.*, Case No. 1:23-cv-06895, Second Amended Complaint filed May 13, 2025 (Dkt. 120).
[7] *Id*.
[8] *Id*.
[9] Brendan Coffey, Eben Novy-Williams, *Fanatics Sales Hit $8.1B Amid Push Into Betting, Collectibles*, Sportico, January 23, 2025,

### C.  FANATICS COAS, HOLOGRAMS, AND UIDS

34.    Plaintiff and Class Members purchased items with COAs, Holograms, and/or UIDs that provided additional value by making the item verifiably unique and authentic, or so they thought.

35.    Fanatics claims that its program, Fanatics Authentic, "is all about providing fans with 100% guaranteed authentic autographed memorabilia, trading cards, signed photos, helmets, and collectibles. … Fanatics is able to offer genuine memorabilia from one of the most respected companies in the industry. … To verify, find the hologram on the product, then enter the number printed at the bottom of the hologram."[10]

36.    Fanatics claims it has "partnered with OpSec Security to develop an innovative security label that exceeds the capabilities of traditional holograms. This tamper-evident, dual factor, optically variable device strengthens an already comprehensive authentication program guaranteeing your artifact is 100% genuine. Additionally, our unprecedented access to some of the sports world's most prominent brands and athletes further reinforces the authenticity of our vast catalog of high-value memorabilia, giving our fans peace of mind when collecting."[11]

37.    Fanatics' holograms program extends back over a decade. "**At Fanatics, we're committed to protecting our fans from counterfeiters by proactively staying ahead of their evolving tactics to replicate security labels and mislead consumers. Our commitment is reflected in our continuous upgrades with the latest anti-counterfeiting technology to fortify**

---

https://www.sportico.com/business/finance/2025/fanatics-2024-sales-rise-1234824898/, last visited September 3, 2025.
[10]See https://www.fanaticsauthentic.com/authenticity-verification/x-391716+z-95228376-216459834#:~:text=Fanatics%20Hologram%20Authenticity%20Verification,the%20bottom%20of%20the%20hologram, last visited July 24, 2025.
[11] https://www.fanatics.com/fansecure, last visited July 24, 2025.

**our defense against fraudsters and build trust in our products' authenticity. As we evolve and enhance our authentication program, our verification platform will continue to support past security labels.**"[12] (Emphasis added).

38.     Fanatics has even implemented a "new color-coded holograms" program to "recognize rarity at a glance" with each hologram "tied to a specific limited-edition count."[13]



39.     Fans use Fanatics platform to authenticate their items. For example, as of April 2023, the hologram comes with a "dynamic QR code" a "Unique ID (UID)" and a "Keycode." The Dynamic QR Code is scannable and directs the user to enter their "randomized 3-letter code that can be entered in any order and can be revealed by adjusting the viewing angle of your collectible." The UID, "[w]hen combined with the 3-letter Keycode verifies the authenticity of your collectible."[14]

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

40.     COAs are sold with items but are not attached to items in the way hologram stickers typically are. Other times a  hologram sticker may be on the COA. Examples of a separate COA compared to Holograms and UIDs are below:

**COA**:



# Fanatics Authentic

Fanatics Authentic is a recognized leader in sports memorabilia, offering officially licensed products from major leagues like the NFL, NBA, MLB, and NHL. Their items are authenticated using a tamper-evident hologram and a unique serial number, which collectors can verify through an online system. This transparency ensures that every product can be traced back to its original event or athlete, adding an unmatched level of confidence.

**Hologram Verification:**







**UID:**



### DYNAMIC QR CODE

Easily verify the authenticity of your collectible in minutes by scanning the QR code and entering your randomized 3-letter KeyCode.

### UNIQUE ID (UID)

When combined with the 3-letter KeyCode verifies the authenticity of your collectible.

### KEYCODE

Contains a randomized 3-letter code that can be entered in any order and can be revealed by adjusting the viewing angle of your collectible.

### HOLOGRAM EVOLUTION

At Fanatics, we're committed to protecting our fans from counterfeiters by proactively staying ahead of their evolving tactics to replicate security labels and mislead consumers.

Our commitment is reflected in our continuous upgrades with the latest anti-counterfeiting technology to fortify our defense against fraudsters and build trust in our products' authenticity.

As we evolve and enhance our authentication program, our verification platform will continue to support past security labels.



### COLLECT WITH CONFIDENCE

Fanatics, the destination for officially licensed sports merchandise, partnered with OpSec Security to develop an innovative security label that exceeds the capabilities of traditional holograms.

This tamper-evident, dual-factor, optically variable device strengthens an already comprehensive authentication program guaranteeing your artifact is 100% genuine.

Additionally, our unprecedented access to some of the sports world's most prominent brands and athletes further reinforces the authenticity of our vast catalog of high-value memorabilia, giving our fans peace of mind when collecting.

UNPRECEDENTED
**ACCESS**

UNMATCHED
**AUTHENTICITY**

UNBEATABLE
**PROTECTION**



**Hologram authentication**

All items at Fanatics Authentic are protected with hologram authentication. Customers can easily check if their items are authentic by entering the code on their included hologram tags in the on-site checker. This makes it simple to see the proper authentication of each of your memorabilia items. Each code is unique to each item, so customers can be sure there are no companies or fakes with Fanatics Authentic.

### D. THE COMPANY KNEW ITS COAs, HOLOGRAMS, AND/OR UIDs WERE COMPROMISED DUE TO A SECURITY BREACH.

41.    According to reports, Lemieux was able to pull off the alleged large-scale counterfeit scheme by faking COAs, Holograms, and UIDs on counterfeit authentication stickers for collectibles, including Fanatics.[15]

42.    Lemieux would generate the fake COAs, Holograms, and UIDs using legitimate codes to sell counterfeit memorabilia at a price far lower than market.[16]

43.    Lemieux stated in his online post that, "I bought so much [Fanatics] didn't know what to say or do but… I set out to make as many [F]anatics counterfeit stickers I could. Millions upon millions."[17]

44.    "People have known about this guy. They've known his work. They know what he's been up to" said well-known sports memorabilia expert Steve Grad ("Grad"). "He has been at it for years and years. And he's driven down the price of things."[18]

45.    "[Lemieux] was able to duplicate the numbers from signings and knock off the autographs. So instead of let's say [an athlete] did 2,000 signings, he could make that 2,000 into

---

[15] *See* Mitch Fink, Memorabilia dealer found dead after alleged $350 million counterfeit confession on facebook, New York Post, July 18, 2025, https://nypost.com/2025/07/18/sports/memorabilia-dealer-found-dead-after-350-million-counterfeit-confession/, last visited July 24, 2025; *see also* Matt Schilling, *Billion Dollar Counterfeit Scheme Rocks Autographed Sports Memorabilia Market*, Sports Illustrated, July 18, 2025, https://www.si.com/collectibles/billion-dollar-counterfeit-scheme-rocks-autographed-sports-memorabilia-market, last visited September 3, 2025..

[16] *Id*.

[17] Matt Schilling, *Billion Dollar Counterfeit Scheme Rocks Autographed Sports Memorabilia Market*, Sports Illustrated, July 18, 2025, https://www.si.com/collectibles/billion-dollar-counterfeit-scheme-rocks-autographed-sports-memorabilia-market, last visited September 3, 2025.

[18] Scooby Axson, Josh Peter, *Man found dead amid investigation for selling counterfeit sports memorabilia*, updated July 19, 2025, USA Today, https://www.usatoday.com/story/sports/2025/07/18/man-under-investigation-for-counterfeit-sports-memorabilia-found-dead/85275534007/, last visited September 4, 2025.

10,000 or 15,000. He's got the numbers [referring to the Holograms and/or UID codes] and he could just keep pumping."[19]

46.    Lemieux would then seek out items being sold by companies like Fanatics, and "then what he did is he went in and he started duplicating their shirts and taking their exclusive athletes. … So the unknowing customer, whoever bought that item, would then take it and go to whatever company it was, PSA, JSA, Fanatics, Beckett." Then when the authenticator or customer went to Fanatic's website, "type in that number, it would come as a [] signed jersey with all the details. And nobody had done that before that I was aware of…. [Lemieux] would do this with Aaron Judge. He did this with anybody you could really think of…"[20]

47.    Lemieux came onto Fanatics' radar almost a decade ago as a potential sports memorabilia counterfeiter. The Company told The Athletic it altered its authenticity hologram sticker two years ago in part because of Lemieux's alleged activities.[21]

48.    "We have an entire team that includes former FBI agents that are out there going after bad actors like this one," said Ravid, Fanatics president of specialty business and new ventures. "We're constantly monitoring what is happening in the ecosystem, especially in the

---

[19] Dana Hunsinger Benbow, *Westfield man posts manifesto of $350 million sports memorabilia scam then dies by suicide*, Indianapolis Star, updated July 24, 2025, https://www.indystar.com/story/sports/2025/07/22/brett-lemieux-manifesto-350-million-sports-memorabilia-scam-suicide-westfield-autographs/85267242007/, last visited July 24, 2025; see also Dana Hunsinger Benbow, *Autographed Patrick Mahomes, Tom Brady jerseys faked in Westfield sports memorabilia scam*, Indianapolis Star, July 27, 2025, https://www.indystar.com/story/sports/2025/07/27/patrick-mahomes-tom-brady-jerseys-faked-in-westfield-memorabilia-scam/85392542007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z116028p117650c117650e005800v116028b0050xxd005065&gca-ft=156&gca-ds=sophi, last visited September 4, 2025.
[20] *Id.*
[21] Larry Holder, Fanatics aided criminal investigation into sports memorabilia dealer. The dealer was later found dead., The Athletic, July 18, 2025, https://www.nytimes.com/athletic/6501407/2025/07/18/brett-lemieux-fake-autograph-case/, last visited July 24, 2025.

marketplaces. And so we were able to follow this guy. We knew about [Lemieux] as long as seven or eight years ago at this point. … Our No. 1 concern is protecting the market, protecting the fan and ensuring that good actors like ourselves and other players aren't being hurt because of a few bad apples in the ecosystem."[22]

49.    The extent of Lemieux's counterfeit operation was so extensive, it was using legitimate COA, Hologram, and/or UID codes to bolster the credibility of their counterfeits. "Every one item from a signing turned into 10,000. And it was certified. … I had every hologram we ever made extracted from every company['s] data base and put into excel. So with a touch of a button I can type [an athlete's name] and a bin shoot out with every [] sticker hologram or COA card. It was a thrill having every athlete in every sport from every authentication company at your finger tips to produce the signature flawless and authenticate it. … The fact that not one dealer that knew what we were doing to the industry, or even when I took their exclusive [Hologram and signature athlete's signature,] no one ever picked up a phone to confront me. That baffled me. … Every company made changes. We did too. They added security. We did too."[23]

50.    Fanatics brought a suit against many counterfeiter's and fraudulent online shops in December 2023 but did not name Limeux or his front company, Mister Mancave, despite knowing about Lemieux and his operation.[24]

---

[22] *Id.*
[23] Matt Schilling, *Billion Dollar Counterfeit Scheme Rocks Autographed Sports Memorabilia Market*, Sports Illustrated, July 18, 2025, https://www.si.com/collectibles/billion-dollar-counterfeit-scheme-rocks-autographed-sports-memorabilia-market, last visited September 4, 2025.
[24] Eben Novy-Williams, Michael McCann, *Fanatics Sues 200 Websites for Cybersquatting, Fake Merch*, Sportico, December 22, 2023, https://www.sportico.com/law/news/2023/fanatics-counterfeit-merch-lawsuit-234760886/#:~:text=By,the%20NBA%2C%20NFL%20and%20NHL, last visited September 4, 2025.

51.     Fanatics continued to sell Plaintiff and Class Members' items with a COA, Hologram, and/or UID. Whether or not the items Fanatics sold are legitimate or authentic, the COAs, Holograms, and UID codes were compromised. As a result, Plaintiff and Class Members paid more for their sports memorabilia because the benefit of the bargain included this unique authentication code and pattern for verification, when in reality the Company's unique authentication codes and patterns were being replicated on counterfeit items while Defendants knew of the counterfeit operation.

E. **THE FTC ACT AND THE COMPANY'S PREVENTABLE SECURITY BREACH**

52.     Section 5 of the FTC Act broadly prohibits unfair and deceptive trade practices (15 U.S.C. § 45).

53.     The FTC requires advertisers to possess a reasonable basis for their advertising and marketing claims.[25]

54.     The FTC requires that an advertiser substantiates its claims (express and implied) before it disseminates said claims, and, when an advertiser actually conveys to a consumer (express or impliedly) that it has a certain level of support or evidence for its products, it must have such substantiation to the actual level it claims to possess.

55.     Data breaches are preventable.[26] "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation

---

[25] The FTC requires companies to "have a reasonable basis for advertising claims before they are disseminated, and "a firm's failure to possess and rely upon a reasonable basis for objective claims constitutes an unfair and deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act. . . ." *See* FTC Policy Statement Regarding Advertising Substantiation, appended to *In the Matter of Thompson Medical Co.,* 104 F.T.C. 648, 839 (1984), *aff'd,* 791 F.2d 189 (D.C. Cir. 1986).
[26] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.

of appropriate security solutions."[27] "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[28]

56.     Most reported data breaches "are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."[29]

57.     The FTC has published guidelines that establish reasonable data security practices for businesses.[30]

58.     The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[31]

59.     The FTC guidelines establish that businesses should protect the confidential information that they keep; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems.[32]

60.     The FTC guidelines also recommend that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating

---

[27] *Id.* at 17.

[28] *Id.* at 28.

[29] *Id.*

[30] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[31] *Id.*

[32] *Id.*

hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[33]

61.     Upon information and belief, Fanatics failed to follow reasonable and necessary industry standards to prevent a data breach, resulting in the theft and use of their COAs, Holograms, and UIDs to legitimize counterfeit items.

### F.  FANATICS INTENDED CONSUMERS' RELIANCE AND INDUCED CUSTOMERS' PURCHASE OF THE MEMORABILIA PRODUCTS

62.     Fanatics' advertising and marketing scheme was constructed in order to induce consumers to purchase their memorabilia products over other companies' products, and to do so at a premium price.

63.     The claims at issue – which are alleged herein as misleading, inaccurate, and/or false, as well as lacking a proper factual basis and required evidentiary substantiation – are material to consumer's decision whether to purchase them. Fanatics negligently, recklessly and/or intentionally failed to disclose material information that, if known to a consumer, would inform their perception of the claims affirmatively made, and would affect the purchase decision. The misrepresentations and omissions also have material consequences on consumers' memorabilia products.

64.     Fanatics sought to instill consumer trust and confidence with terms like "unique" "authentic" and "staying ahead of [counterfeiters] evolving tactics to replicate security labels and mislead consumers."[34] Fanatics retained the unique "KeyCode" associated with the COAs, Holograms, and/or UIDs for purchasers to verify their unique and authentic memorabilia products.

---

[33] *Id.*

[34] See https://www.fanatics.com/fansecure#:~:text=Authenticity%20Verification%20powered%20by%20FanSecure,Authenticate, last visited July 30, 2024.

65. Fanatics charges more for its memorabilia products than it does for Fanatics other non-memorabilia products.[35]

66. Fanatics negligently continues to promote and overcharge for its compromised COAs, Holograms, and UIDs despite acknowledging that at least one counterfeiter had and used Fanatics "unique" codes associated with its COAs, Holograms, and/or UIDs.

67. Fanatic's misleading claims, material omissions, and its false and deceptive marketing campaign as a whole, are materially misleading and likely to deceive (and have deceived) consumers, and are intended to induce reliance and the purchase of Fanatic's memorabilia products.

## G. Consumers' Reliance was Reasonable and Justified

68. Each and every purchaser of Fanatics memorabilia products, including the named Plaintiff and Class Members, were exposed to Defendants' claims of products unique and authentic markers. In addition to online and print marketing ads, the Company's claims are printed on COAs, Hologram verification cards, and other papers produced by Fanatics league partners (*i.e.,* MLB, NBA, NFL, NHL, WNBA, etc.).

69. Fanatics messaging of authenticity, genuine articles, and unique code verifications foster a reasonable expectation that Fanatics is a trustworthy brand, that its claims were legitimate, and its products with COAs, Holograms, and UIDs were unique and uncompromised.

---

[35] See https://www.fanatics.com/collectibles-and-memorabilia-authentic-memorabilia/d-20008815+c-97772376+z-983-2833558357?_ref=m-TOPNAV compared to items from its standard shop(s) https://www.fanatics.com/jerseys/d-31779089+z-9154823-2286919689, showing signed jerseys being charged at higher prices than unsigned jerseys.

70.     Consumers reasonably relied on the repeated claims that the memorabilia with COAs, Holograms, and UIDs were unique, uncompromised, and could be verified by entering the codes into the Fanatics website to check against its database.

71.     An average consumer lacked any reasonable or meaningful ability to test or practically verify Fanatics' claims. Consumers cannot reasonably be expected to research and independently ascertain the truthfulness of the claims made by the sellers they pay for products.

72.     This is particularly so in the context of the purchase of memorabilia products from an apparel and memorabilia company, and the consumer may reasonably rely upon the expertise of the apparel and memorabilia company that introduces unique and authentic items to the retail market. Reasonable typical consumers lack sufficient training to discern the validity of such claims, which requires a certain level of expertise and specialized knowledge; nor should consumers be reasonably expected to question or investigate these types of claims by Fanatics.

73.     Fanatics has gone out of its way to market and invite consumers to its website and/or the official shop website of top sports leagues, to advertise its memorabilia as unique, authentic, and verifiable. Consumers' justifiable reliance is inextricably wound up in Fanatic's marketing, which was substantial in content and volume, and persistently underscoring its 'unique' and 'authentic' engaging branding in order to influence consumer perceptions and cultivate trust and confidence.

74.     Consumers relied on Fanatic's claims and were induced to believe that the memorabilia products it solicited and sold to consumers were authentic, unique, and therefore uncompromised, when in reality Fanatics knew or should have known its 'unique' and 'authentic' COAs, Holograms, and UIDs, were compromised. Unfortunately, consumers paid a premium price for their memorabilia products and suffered economic injury.

### H.  VALUE OF PLAINTIFF AND CLASS MEMBERS' SPORTS MEMORABILIA

75.    Fanatics continuing to sell Plaintiff and Class Members' memorabilia that Fanatics advertised as having a unique COA, Hologram, and/or UID was a deceptive and fraudulent practice because the Company knew or should have known its codes attached to the COA, Hologram, and UID were compromised.

76.    Fanatics' deceptive and fraudulent conduct is inexcusable due to its actual or constructive knowledge that its codes attached to its COAs, Holograms, and UIDs were compromised and being used to legitimize counterfeit items, detrimentally impacting Plaintiff and Class Members' memorabilia value and overcharging for compromised COAs, Holograms, and UIDs.

77.    Fanatics did not warn or otherwise take necessary action to make its conduct not deceptive, unfair, or fraudulent, and, further, benefited from Plaintiff and Class Members in the form of overpayment for memorabilia items.

### I.  PLAINTIFF MENZER'S EXPERIENCE

78.    Plaintiff Menzer trusted that her purchase of the sports memorabilia item was not only authentic and genuine but had unique identification to verify it as a genuine article.

79.    Plaintiff Menzer paid approximately $645 for the sports memorabilia item, in this case an autographed New York Yankees Aaron Judge Fanatics Authentic Deluxe Framed 16" x 20 " photograph of him running out of the dugout.[36]

80.    Plaintiff Menzer would not have paid the hefty fee for the item had she known the COA, Hologram, and or UID attached to the item verifying its authenticity were compromised.

---

[36] Plaintiff Menzer's purchase was discounted using a coupon as the original price was $849.99 as of January 31, 2024, through MLB Shop's website which is operated by Fanatics Group North, LLC and is a subsidiary or affiliate of Fanatics Holdings, Inc.

81.    As a result, Plaintiff Menzer overpaid for the item because part of her purchase included the purported legitimate and uncompromised COA, Hologram, and/or UID and suffered monetary damages.

82.    Plaintiff Menzer's claims for damages are typical of Class Members as all overpaid for the COAs, Holograms, and/or UIDs they believed were unique identifiers of their items when, in reality, counterfeiters had accessed the Company's codes and were using these codes to pass of counterfeit memorabilia.

## V.    CLASS ACTION ALLEGATIONS

83.    Plaintiff brings this nationwide class action on behalf of herself and on behalf of all others similarly situated pursuant to Fed. R. Civ. P. 23.

84.    The Class that Plaintiff seeks to represent is denied as follows:

> All individuals who purchased memorabilia with a Certificate of Authenticity, Hologram, and/or Unique ID from Defendants within the last eight years.

85.    Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; any individuals and their associates who are found guilty of participating in the counterfeit of Defendants' memorabilia; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

86.    Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

87.    **Numerosity:** The Class is so numerous that joinder of all members is impracticable. Defendants have sold hundreds of thousands of sports memorabilia items. The Class contains at least thousands, if not hundreds of thousands, of people who may be identified through Defendants' records.

88.    **Commonality:** Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

    a.    Whether Defendants' COAs, Holograms, and UIDs were compromised;

    b.    Whether Defendants knew or should have known the COAs, Holograms, and UIDs were compromised;

    c.    Whether and to what extent Defendants had a duty to disclose the COAs, Holograms, and UIDs were compromised to Plaintiff and Class Members;

    d.    Whether Defendants had a duty not to sell sports memorabilia that contained COAs, Holograms, or UIDs that were compromised to Plaintiff and Class Members;

    e.    Whether Defendants failed to adequately safeguard the COAs, Holograms, and UIDs that Plaintiff and Class Members purchased as part of the memorabilia;

    f.    When Defendants actually learned of the breach of its COAs, Holograms, and UIDs;

    g.    Whether Plaintiff and Class Members' sports memorabilia has suffered in value due to the Company's compromised COAs, Holograms, and UIDs.

    h.    Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members that their COAs, Holograms, and UIDs had been compromised;

    i.    Whether Defendants violated the law by failing to promptly notify Plaintiff and Class Members that their COAs, Holograms, and UIDs had been compromised;

    j.    Whether Defendants failed to implement and maintain reasonable security

procedures and practices appropriate to the nature and scope of their COAs, Holograms, and UIDs;

k.  Whether Defendants adequately addressed and fixed the vulnerabilities that permitted the Breach to occur;

l.  Whether Defendants engaged in unfair, unlawful, or deceptive practice by failing to safeguard the COAs, Holograms, and/or UIDs sold to and purchased by Plaintiff and Class Members;

m.  Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct; and

n.  Whether Plaintiff and Class Members are entitled to restitution as a result of Defendants' wrongful conduct.

89.  **Typicality:** Plaintiff's claims are typical of those of other Class Members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions and each purchased memorabilia from Defendants that was compromised as a result of the security breach, due to Defendants' misfeasance.

90.  **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct with respect to the Class as a whole. Defendants' policies challenged herein apply to, and affect, Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

91.    **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

92.    **Superiority and Manageability:** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds, if not thousands, of individual actions, would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

93.    **Ascertainability and Notice:** The proposed Classes are each defined with reference to objective criteria. A reliable and administratively feasible mechanism exists for the determination of membership of each of the proposed Classes. Plaintiff and their counsel anticipate that notice to the proposed Class Members will be effectuated through recognized, Court-approved notice dissemination methods which may include the United States mail, electronic mail, internet postings, and/or other published notice.

94.     The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since the Company would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

95.     The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

96.     Adequate notice can be given to Class Members by directly using information maintained in Defendants' records.

97.     Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.  Whether Defendants owed a legal duty to Plaintiff and Class Members to exercise due care in generating, storing, using, COAs, Holograms, and UIDs to sell sports memorabilia;

b.   Whether Defendants breached a legal duty to Plaintiff and Class Members by selling sports memorabilia with COAs, Holograms, and UIDs that Defendants knew or should have known were compromised;

c.   Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d.   Whether Defendants adequately and accurately informed Plaintiff and Class Members that their COAs, Holograms, and UIDs had been compromised;

e.   Whether Defendants' continued practice of advertising and selling memorabilia with compromised COAs, Holograms, and UIDs impacted the value of Plaintiff's and Class Members' purchase and value of their memorabilia;

f.   Whether Defendants engaged in unfair, unlawful, or deceptive practices by continuing to advertise and sell memorabilia with compromised COAs, Holograms, and UIDs that Defendants knew or should have known were being utilized by counterfeiters; and

g.   Whether Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct.

## CAUSES OF ACTION

### COUNT I

**BREACH OF EXPRESS WARRANTY**
**(On behalf of Plaintiff and the Class)**

98.    Plaintiff incorporates by reference paragraphs 1 through 97 as though fully set forth herein.

99.    Plaintiff brings this claim under Article 2 of the Uniform Commercial Code (the

"UCC") (as adopted and codified under New York UCC law at § 2-313, and other states where members of the Nationwide Class reside) and do so on behalf of herself and the members of the Class.

100.    Under Section 2-313 of the UCC, affirmation of fact or promise made by the seller to the buyer, which relates to the goods and are a basis of the bargain, create an express warranty that the goods shall conform to the affirmation or promise.

101.    In connection with the sale of the memorabilia products, the "details" section of the purchase states that the item is "individually numbered" with a Hologram that is "authenticated with FanSecure technology and can be verified" at Fanatics website fanatics.com/fansecure.

102.    Defendants' affirmations of fact or promise were made to the Plaintiff and Class Members on advertisements for the product, the sale page of the product, the packaging and labeling of the product, on Defendants' website(s), and in other online retail sites and digital and print advertising.

103.    These affirmations of fact or promise were material and became part of the basis of the bargain between Defendants on the one hand, and Plaintiff and Class Members on the other, thereby creating express warranties that the memorabilia products would conform to such affirmations of fact and promise.

104.    Plaintiff and Class Members were in direct privity with Defendants and/or its agents or were intended third-party beneficiaries of the warranties breached to the extent required by law.

105.    Plaintiff and Class Members reasonably and justifiably relied on Defendants' express warranties, believing that the memorabilia products they purchased would conform to the express warranties.

106.    Defendant breached its express warranties because the Defendants' memorabilia

products do not, in fact, conform to the affirmations of fact or promise. Defendants knew, or should have known, that its COAs, Holograms, and UIDs codes were compromised, yet Defendants continued to solicit and sell items with these codes as if they were not compromised.

107.    Plaintiff and Class members were injured as a direct and proximate result of Defendants' breach because Plaintiff and Class Members did not receive the benefit of the bargain, as the memorabilia products did not have "unique" COAs, Holograms, and/or UIDs as represented by Defendants, and Defendants failed to preserve the integrity of the COAs, Holograms, and UIDs. Plaintiff and Class Members suffered injury because had they known the true facts that Defendants knew, they would not have purchased the memorabilia items or not paid the premium price as compared to similar products that did conform as warranted and represented.

108.    Within a reasonable time after she knew of Defendants' warranty breaches, Plaintiff Menzer, on behalf of herself and Class Members, placed Defendants on notice of its breach through filing this lawsuit to give Defendants the opportunity to cure.

109.    As a direct and proximate result of Defendants' breaches of express warranty, Plaintiff and Class Members have been damaged by the difference in value between the memorabilia items as advertised with COAs, Holograms, and UIDs that are truly unique to the individual item and the items sold which Defendants knew were being mimicked down to the associated codes, in an amount to be proven at trial.

## COUNT II

### BREACH OF IMPLIED CONTRACT
### (On behalf of Plaintiff and the Class)

110.    Plaintiff incorporates by reference paragraphs 1 through 97 as though fully set forth herein.

111.    Plaintiff and Class Members entered into implied contracts with Defendants under

which Defendants agreed to safeguard and protect the COAs, Holograms, and UIDs Plaintiff and

Class Members purchased and to timely and accurately disclose and/or notify Plaintiff and Class

Members that this information had been breached and compromised.

112.    Plaintiff and Class Members paid money, or money was paid on their behalf, to

Defendants in exchange for valid, valuable, and unique COAs, Holograms, and UIDs.

113.    Defendants generated, offered, and sold Class Members COAs, Holograms, and

UIDs as part of Defendants' regular business practices of soliciting and selling memorabilia.

Plaintiff and Class Members accepted Defendants' offers and provided their payment to

Defendants.

114.    Defendants retained possession of Plaintiff's and Class Members' COAs,

Holograms, and UIDs for the purpose of providing authentication services to Plaintiff and Class

Members.

115.    When Plaintiff and Class Members paid money and for the COAs, Holograms, and

UIDs to Defendants, either directly or indirectly, in the exchange for goods and services, they

entered into implied contracts with Defendants and intended and understood that COAs,

Holograms, and UIDs would be adequately safeguarded as part of that service.

116.    Plaintiff and Class Members entered into implied contracts with Defendants under

which Defendants agreed to safeguard and protect such COAs, Holograms, and UIDs and to timely

and accurately notify and/or disclose to Plaintiff and Class Members that their COAs, Holograms,

and/or UIDs had been breached and/or compromised.

117.    In generating and retaining exclusive control over such COAs, Holograms, UIDs,

that Plaintiff and the other Class Members payment for them, an implied contract existed with

Defendants whereby Defendants became obligated to reasonably safeguard Plaintiff's and the

other Class Members' COAs, Holograms, and UIDs.

118.    Plaintiff and Class Members intended and understood that Defendants would adequately safeguard the COAs, Holograms, and UIDs as part of that service.

119.    The implied promises include but are not limited to: (1) taking steps to ensure that any agents who are granted access to COAs, Holograms, and UIDs information also protect the confidentiality of that data; (2) taking steps to ensure that the information that is placed in the control of Defendants' agents is restricted and limited to achieve an authorized purpose; (3) restricting access to qualified and trained agents; (4) designing and implementing appropriate retention policies to protect the information against criminal data breaches; (5) applying or requiring proper encryption; (6) multifactor authentication for access; and (7) other steps to protect against foreseeable data breaches.

120.    Defendants' implied promises to safeguard the COAs, Holograms, and UIDs are evidenced by the information contained on its website.

121.    Plaintiff and Class Members would not have paid the premium price for memorabilia that included the COAs, Holograms, and UIDs to Defendants in the absence of such an implied contract.

122.    Had Defendants disclosed to Plaintiff and Class Members that they did not have adequate computer systems and/or security practices to secure this sensitive data, Plaintiff and the other Class Members would not have paid Defendants the premium for the memorabilia that included the COAs, Holograms, and UIDs.

123.    Defendants recognized that Plaintiff's and Class Members' COAs, Holograms, and UIDs is highly sensitive information and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and the other Class Members.

124.    Plaintiff and the other Class Members fully performed their obligations under the implied contracts with Defendants.

125.    Defendants breached the implied contract with Plaintiff and the other Class Members by failing to take reasonable measures to safeguard the COAs, Holograms, and UIDs as described herein.

126.    As a direct and proximate result of Defendants' conduct, Plaintiff and the other Class Members suffered and will continue to suffer damages in an amount to be proven at trial, or alternatively, nominal damages.

## COUNT III

### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (On Behalf of Plaintiff and the Class)

127.    Plaintiff incorporates by reference paragraphs 1 through 97 as though fully set forth herein.

128.    An implied contract existed between Plaintiff and Defendants. The covenant of good faith and fair dealing accompanies every contract, including those formed through implied terms, and prohibits one party from acting in a way that would injure the other party's right to receive the benefits of the agreement.

129.    Plaintiff and Class Members had an implicit agreement that their purchase included COAs, Holograms, and UIDs that were unique and legitimate and that Defendants would only provide the unique and legitimate COAs, Holograms, and UIDs to each purchase made for its memorabilia.

130.    Furthermore, Defendants had implicitly agreed to safeguard the COAs, Holograms, and UIDs attached to memorabilia it sold to Plaintiff and Class Members.

131.    Defendants breached the implied covenant of good faith and fair dealing in the party's implied contract by knowingly selling compromised COAs, Holograms, and UIDs and failing to safeguard the COAs, Holograms, and UIDs exclusively held in their possession.

132.    Defendants' breaches of their duty of good faith and fair dealing have damaged Plaintiff and Class Members by depriving them of the benefit of the bargain for their purchase of memorabilia.

## COUNT IV

### INTENTIONAL MISREPRESENTATION
### (On Behalf of Plaintiff and the Class)

133.    Plaintiff incorporates by reference paragraphs 1 through 97 as though fully set forth herein.

134.    Plaintiff brings this Count on behalf of themselves and on behalf of the members of the Class.

135.    Defendants have represented to the public, including Plaintiff, by promoting marketing, advertising, labeling, and other means, that the memorabilia products have characteristics and qualities associated with them through their COAs, Holograms, and UIDs that they do not have. Such representations include but are not limited to these items being "unique" "authentic" and by implication uncompromised. These representations were material, and uniformly made.

136.    At the time Defendants made the representations herein, Defendants knew the representations were false and/or made them with fraudulent intent.

137.    Defendants made the representation herein with the intention of depriving Plaintiff and other Class Members of the full benefit of their purchases or otherwise causing injury, and thus Defendants have committed intentional misrepresentations.

138.    Defendants' deceptive or fraudulent intent may be inferred by allegations and evidence of motive and opportunity, as well as strong circumstantial evidence of conscious misbehavior or recklessness. In the instant case, the allegations previously asserted herein that support scienter include, but are not limited to: Defendants knew they did not have adequate security to protect the COAs, Holograms, and UIDs they were attaching to memorabilia and soliciting to consumers such as Plaintiff and Class Members; Defendants knew of the alleged counterfeit operation and knew or should have known that the alleged counterfeit operation was using the Company's legitimate codes associated with COAs, Holograms, and/or UIDs; Defendants continued to solicit and sell memorabilia products to Plaintiff and Class Members in part, through claims that each item was unique and able to be authenticated through the COA, Hologram, or UID associated with the item; Defendants omitted their knowledge that the COAs, Holograms, and UIDs associated codes were compromised and in the hands of a known counterfeit operation. Defendants knew that consumers would place trust and confidence in their product claims and rely thereon in their purchase of the products. In addition to Fanatic's awareness that its claims were unsubstantiated and the COAs, Holograms, and UIDs were compromised and being used on duplicated illegitimate items, Defendants generated a great profit by instilling confidence in its consumer base that its claims were credible; as such, Defendants' motive and opportunity to deceive, and access to accurate information is further strong circumstantial evidence.[37]

139.    Plaintiff and other Class Members believed and relied on Defendants' promoting, marketing, advertising, and labeling of the memorabilia products, and in justifiable reliance thereon, purchased and used them.

---

[37] *See, e.g., Hughes v. Ester C. Co.,* 930 F.Supp.2d 439 (E.D.N.Y. 2013); *Greene v. Gerber Products Co.,* 262 F.Supp.3d 38 (E.D.N.Y. 2017).

140.    As a proximate result of these acts and omissions, Plaintiff and Class Members were induced to spend money on the memorabilia products and they were damaged in the economic loss of money spent (in an amount to be determined at trial) on the memorabilia products that were not as represented, and that were not worth the full value paid, and which Plaintiff and Class Members would not have purchased, or paid less for, but-for the misrepresentations and material omissions.

141.    As a direct and proximate result of Defendants' misrepresentations, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

## COUNT V

### NEGLIGENT MISREPRESENTATION
**(On Behalf of Plaintiff and the Class)**

142.    Plaintiff incorporates by reference paragraphs 1 through 97 as though fully set forth herein.

143.    Defendants generated COAs, Holograms, and UIDs for their memorabilia that was then solicited and sold to Plaintiff and Class Members.

144.    Upon soliciting and selling the memorabilia, Defendants represented to the unwitting customers, such as Plaintiff and Class Members, that the COAs, Holograms, and UIDs attached to the memorabilia item was genuine, authentic, and unique (*i.e.*, not compromised).

145.    Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care to secure and safeguard the COAs, Holograms, and UIDs and to use secure methods to do so.

146.    Defendants, having full knowledge of the sensitivity of the COAs, Holograms, and UIDs, knew the types of harm that Plaintiff and Class Members could and did suffer if this information was wrongly disclosed and used by counterfeiters and the importance of adequate security.

147.    Plaintiff and Class members were the foreseeable victims of any inadequate safety and security practices. Plaintiff and Class Members had no ability to protect their COAs, Holograms, and UIDs that were in Defendants' exclusive possession. As such, a special relationship existed between Defendants and Plaintiff and the Class.

148.    Defendants admit they were aware that counterfeiters, particularly Lemieux, targeted Fanatics and other large memorabilia companies with counterfeit items that used Defendants' COAs, Holograms, or UIDs.

149.    Defendants owed Plaintiff and Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiff and the Class when generating, storing, using, and managing the COAs, Holograms, and UIDs, including reasonably safeguarding such data.

150.    Defendants' duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct, or in this instance misconduct, exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B.

151.    Defendants had duties to disclose to buyers of their memorabilia, such as Plaintiff and Class Members, that their COAs, Holograms, and/or UIDs are not unique to the individual item and may be or were used to legitimize counterfeit items of a similar nature.

152.    Defendants had duties to protect the COAs, Holograms, and UIDs of Plaintiff's and the Class's memorabilia from being vulnerable to counterfeit by taking reasonable precautions. Additional duties that Defendants owed Plaintiff and the Class include:

a.  To exercise reasonable care in designing, implementing, maintaining, monitoring, and testing Defendants' networks, systems, protocols, policies, procedures and practices to ensure that Plaintiff's and Class Members' COAs, Holograms, and UIDs were adequately secured from impermissible access, viewing, release, disclosure, and publication;

b.  To protect Plaintiff's and Class Members' memorabilia associated COAs, Holograms, and UIDs in its possession by using reasonable and adequate security procedures and systems;

c.  To implement processes to quickly detect a data breach, security incident, or intrusion involving their networks and servers; and

d.  To promptly notify Plaintiff and Class Members of any data breach, security incident, or intrusion that affected or may have affected their COAs, Holograms, and/or UIDs.

153.    Defendants were the only one who could ensure that their systems and protocols were sufficient to protect the COAs, Holograms, and UIDs with which Plaintiff and the Class entrusted them.

154.    Defendants breached their duties of care by failing to adequately protect Plaintiff's and Class Members' COAs, Holograms, and UIDs. Defendants breached their duties by, among other things:

e.  Failing to exercise reasonable care in generating, retaining, securing, safeguarding, and protecting the COAs, Holograms, and UIDs in their possession;

f.  Failing to protect the COAs, Holograms, and UIDs in their possession using reasonable and adequate security procedures and systems;

g.   Failing to consistently enforce security policies aimed at protecting Plaintiff's and the Class's COAs, Holograms, and UIDs;

h.   Failing to implement processes to quickly detect data breaches, security incidents, or intrusions; and

i.   Soliciting and selling to Plaintiff and Class Members' memorabilia at a premium for COAs, Holograms, and UIDs that the company knew or should have known were compromised.

155.   Defendants' willful failure to abide by these duties was wrongful, reckless, and grossly negligent in light of the foreseeable risks and known threats.

156.   As a proximate and foreseeable result of Defendants' negligent and/or grossly negligent conduct, Plaintiff and the Class have suffered damages.

157.   Through Defendants' acts and omissions described herein, including but not limited to Defendants' failure to protect the COAs, Holograms, and UIDs of Plaintiff's memorabilia items and Class Members from being stolen and misused, Defendants unlawfully breached their duty to use reasonable care to adequately protect and secure the COAs, Holograms, and UIDs of Plaintiff and Class Members's memorabilia while they were within Defendants' exclusive possession and control.

158.   There is a close causal connection between Defendants' failure to implement security measures to protect the COAs, Holograms, and UIDs of Plaintiff's and Class Members' memorabilia and the harms suffered by Plaintiff and the Class. The COAs, Holograms, and UIDs of Plaintiff and Class Members were accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such information by adopting, implementing, and maintaining appropriate security measures.

159.    Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and their customers, and the premiums for which Plaintiff and Class Members paid, which are recognized by laws and regulations including but not limited to the FTC Act and common law. Defendants were in a superior position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Class Members.

160.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants.

161.    Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect the COAs, Holograms, and UIDs. Defendants' conduct was particularly unreasonable given the nature and amount of COAs, Holograms, and UIDs they generated, stored, solicited and sold to Plaintiff and Class Members as part of memorabilia purchases and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

162.    Defendants' violation of Section 5 of the FTC Act constitutes negligence.

163.    Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

164.    The harm that occurred as a result of the security breach is the type of harm against which the FTC Act was intended to guard. The FTC has pursued enforcement actions against businesses that, as a result of their failure to employ reasonable security measures and avoid unfair and deceptive practices, caused similar harm as that suffered by Plaintiff and Class Members.

165.    Defendants' duty to act reasonably in generating, storing, maintaining, soliciting and selling memorabilia with the COAs, Holograms, and UIDs, and to use reasonable care in

protecting such information arose not only as a result of the statutes described above, but also because Defendants are bound by industry standards to protect the COAs, Holograms, and UIDs that they either affirmatively generate, maintain, solicit, and/or store. Industry standards require Defendants to exercise reasonable care with respect to Plaintiff and Class Members by implementing reasonable data security measures that do not create a foreseeable risk of harm to Plaintiff and Class Members. Industry best practices put the onus of adequate security on the entity most capable of preventing a security breach. In this case, Defendants were the only parties that could adequately protect the data that they generated, solicited, and stored.

166.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) the loss of value of their sports memorabilia; (ii) and the loss of the benefit of the bargain that Plaintiff and Class Members originally paid for as part of their respective purchases.

167.    Additionally, Defendants misrepresented that their COAs, Holograms, and UIDs were unique to the items they sold to Plaintiff and Class Members when they knew or should have known the COAs, Holograms, and UIDs were compromised.

168.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

## COUNT VI

### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class in the Alternative to Contract Claims)

169.    Plaintiff incorporates by reference paragraphs 1 through 97 as though fully set forth herein.

170.    Plaintiff brings this claim individually and on behalf of Class Members against Defendants.

41

171.    Unjust enrichment occurs when one party unfairly benefits at the expense of another, without a legal or contractual basis.

172.    Plaintiff and Class Members conferred benefits on Defendants by paying money to Defendants for the purchase of the memorabilia products.

173.    Defendants have knowledge of such benefits.

174.    In turn, Defendants were to provide the memorabilia and unique and legitimate COAs, Holograms, and UIDs attached to the memorabilia and take reasonable steps to safeguard the COAs, Holograms, and UIDs Defendants retained in their possession.

175.    Defendants accepted and retained the benefit of payment despite knowing their COAs, Holograms, and UIDs were compromised by having failed to take reasonable steps to safeguard such information.

176.    Plaintiff and Class Members believed that their purchase included legitimate COAs, Holograms, and/or UIDs and paid more to Defendants for the memorabilia and service of protecting the COAs, Holograms, and UIDs.

177.    Furthermore, Defendants knew they would not be able to provide adequate protection for the COAs, Holograms, and UIDs, but solicited and accepted Plaintiff and Class Members' payment for legitimate COAs, Holograms, and UIDs and for Defendants to protect the authenticity and integrity of such.

178.    Defendants are unjustly enriched in retaining the revenues derived from Plaintiff and Class Members' purchase of the memorabilia products. Retention of those moneys under these circumstances is unjust and inequitable because Defendants misrepresented material information about the memorabilia products' COAs, Holograms, and/or UIDs when soliciting them when in fact Defendants knew or should have known the COAs, Holograms, and UIDs were compromised.

179.    Because Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiff and Class Members is unjust and inequitable, Defendants must pay restitution to Plaintiff and the Class Members as ordered by the Court.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment against Defendants as follows:

1. An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Class requested herein;

2. An order requiring Defendants to pay the costs involved in notifying the Class members about the judgment and administering the claims process;

3. A judgment in favor of Plaintiff and the Class awarding them appropriate monetary relief, including actual and statutory damages, punitive damages, pre-judgment and post-judgment interest, reasonable attorneys' fees, expenses, costs, as allowable by law and such other and further relief as is just and proper;

4. An award of such other and further relief as this Court may deem just and proper.

## VII.    DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.


Dated: September 5, 2025

Respectfully submitted,

/s/ William B. Federman
_____

William B. Federman
(S.D. New York #WF9124)
Alex J. Ephraim*
**Federman & Sherwood**
10205 N. Pennsylvania Ave
Oklahoma City, OK 73120
Telephone: (405) 235-1560
E: wbf@federmanlaw.com
E: aje@federmanlaw.com
*Attorney for the Plaintiff and Proposed*
*Lead Counsel for the Class*

*\*Pro Hac Vice Forthcoming*


Jonathan C. Schwartz*
(New York #4732863)
**Schwartz Legal, PLLC**
8810 SW 8th Street,
Plantation, FL 33324
Telephone: (954) 648-1915
E: jonathan@jcslegal.com
*Attorney for the Plaintiff and Proposed*
*Lead Counsel for the Class*

*\*Admission to SDNY Forthcoming*